[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. INTRODUCTION
Nicholas and Theresa Zappone had two children, Ronald and Richard. Ronald and Richard are the parties in this case. They are both scoundrels. They have, as will be seen, developed a family tradition of conveying a certain piece of property back and forth between each other to protect it from their respective unhappy spouses and reconveying it when protection was deemed no longer necessary. After Nicholas died in 1991, however, Richard decided that the family tradition need no longer be observed. This decision was a convenient one for Richard since he happened CT Page 2260 to be holding the property at the time. Ronald has decided to spend his inheritance by suing Richard to get the property back. Given the fraudulent nature of the whole enterprise, the court will decline to use its equitable powers to intervene.
Ronald's complaint is in one count, seeking the imposition of a constructive trust. Richard has replied with a special defense that Ronald has unclean hands. The court conducted an evidentiary hearing on January 21, 1993, at which it heard the testimony of both brothers and received a number of deeds into evidence. The facts are not altogether easy to find. The court is convinced that Richard lied throughout his testimony, and it discounts his testimony accordingly. Ronald was comparatively more truthful, but his testimony included a significant amount of wishful thinking. Apart from the deeds and a few court documents, neither party presented anything in the way of corroboration. The following facts have been established by a preponderance of the evidence.
II. FINDINGS OF FACT
Nicholas was born in 1915 and Theresa in 1920. They married and had two children. Ronald was born in 1945 and Richard in 1946. The property involved in this case is located at 83 Phyllis Avenue in Waterbury. Nicholas and Theresa purchased the unimproved lot in the 1950's and subsequently built a duplex home on the site. When their children grew up and left home in the late 1960's, Nicholas and Theresa moved into the duplex. Since then, the property has been the subject of a number of conveyances.
First Conveyance
On March 21, 1980, Nicholas and Theresa quit-claimed the Phyllis Avenue property to Ronald and Richard. The deed contains the following qualification: "The Grantors reserve for their lives use and occupancy of said property. The Grantees are joint remaindermen who will take possession of said property and use of said property after the decease of both Grantors." (Ex. A.) This deed appears to have been a bit of informal estate planning by Nicholas, who was then 65. In practical terms, Nicholas and Theresa went on using the property exactly as they had before.
Second Conveyance
Richard was married to a woman named Patricia. Their marriage was going through a difficult period. In April 1978, CT Page 2261 Patricia had filed a dissolution of marriage action, Zappone v. Zappone, No. 45054 (Waterbury J.D.), and the couple had separated. The couple later reconciled, and the action was withdrawn on February 27, 1979. (Ex. 1.) Their marital problems were not yet over. At his pretrial deposition, Richard testified that in 1981, "I was going through a rough time with my marriage, rocky road so-to-speak, and it was brought up [at a family meeting] that my name should come off the house . . . so that if the worst scenario ever transpired . . . my wife wouldn't get ownership." (Ex. 2.) Although Richard repudiated this testimony at trial, claiming confusion in dates, the court does not credit his in-court testimony. Ronald credibly confirmed that Richard was having marital problems at the time, and the court concludes bases on the totality of the evidence that Richard decided to transfer the house to Ronald to protect it from Patricia.
On February 28, 1981, Richard quitclaimed his entire interest in the Phyllis Avenue property to Ronald. The deed recites "[n]o cash consideration." (Ex. C.)
Third Conveyance
Richard's marital problems with Patricia were eventually resolved. (They remain married today.) On June 2, 1984, Ronald quitclaimed to Ronald and Richard jointly the remainder interest in the Phyllis Avenue property for "no cash consideration." (Nicholas and Theresa retained their life interest.) (Ex. D.) Thus, Ronald and Richard resumed the same co-tenancy of the remainder interest that they had first acquired in 1980.
Fourth Conveyance
Ronald married a woman named Lucy in 1964. By 1986, their marriage was on the rocks. On September 11, 1986, Ronald was served with the complaint in a dissolution of marriage action filed by Lucy. Zappone v. Zappone, No. 424989 (Hartford-New Britain J.D. at New Britain). (Ex. G.) Ronald was concerned that Lucy was going to try to obtain all of his property that she could. He went to Nicholas, who was the patriarch of the family and who had consented to each of the earlier conveyances. He told Nicholas that it would be best to transfer his interest in the house to Richard. Nicholas approved. Ronald then told Richard that he was going through a divorce and was putting the property in Richard's name. Richard said "OK." Although their understanding was not to put into words, Richard plainly understood CT Page 2262 that Ronald was attempting to defraud Lucy and that he (Richard) would be expected to return Ronald's share of the property after the divorce.
On September 27, 1986, Ronald quitclaimed all of his interest in the Phyllis Avenue property to Richard. The deed states that there was "[n]o cash consideration — transfer between brothers." (Ex. F.) The court specifically finds that the sole purpose of this conveyance was to defraud Lucy.
The Aftermath
Ronald's fraudulent acts did not end with the transfer of his interest in the Phyllis Avenue property to Richard. He filed two sworn financial statements in the dissolution of marriage action, on October 27, 1986 (Ex. 3), and July 30, 1987 (Ex. 4). Neither statement mentions the Phyllis Avenue property in any way. On July 30, 1987, Judge Googel granted a dissolution of marriage. His judgment does not mention the Phyllis Avenue property. (Ex. H.) The only possible conclusion to draw from this is that the court was completely unaware of Ronald's claim to the Phyllis Avenue property at all stages of the divorce proceedings. Ronald's transfer of the property to Richard had worked its desired effect.
Ronald married a woman named Ann Marie after the divorce. He and Ann Marie began to experience financial difficulties. On October 15, 1990, Ronald and Ann Marie filed a voluntary petition pursuant to 11 U.S.C. ch. 13 (chapter 13 of the Bankruptcy Act). In re Zappone, No. 90-22284 (D. Conn.). Their sworn chapter 13 statement filed with the petition does not mention any claim to the Phyllis Avenue property. The plan provides for payment of the petitioners' debts over a period of three years. That period has not yet expired.
By early 1991, Nicholas was gravely ill with cancer. Ronald told Nicholas that he wanted his interest in the Phyllis Avenue property returned. Nicholas replied that the matter should be left alone for the time being. Later that year, there is some evidence that Nicholas changed his mind, but by that time he was dying. He died on July 24, 1991, and with his passing, the glue that held the family together dissolved. Theresa, who is ill with Alzheimer's disease, was placed in a convalescent home. In August 1991, Ronald asked Richard to return his share of the Phyllis Avenue property, and Richard refused. This action was filed in CT Page 2263 May 1992.
III. CONCLUSIONS OF LAW
The question before the court is whether a constructive trust should be imposed. There is an equitable question, but there is no easy equitable answer. This is because both parties have behaved in a singularly inequitable fashion. Richard, who has the property in question, doesn't deserve to keep it. Ronald, who wants it, doesn't deserve to get it. Since they were jointly engaged in a fraudulent enterprise, the court declines to give affirmative assistance to either one.
The court fully realizes that Richard, who claims that Ronald's hands are unclean, has hands that are very black indeed. Richard has a history of attempting to defraud his own spouse — that, in fact, was an integral part of the family tradition upon which Ronald relied — and Richard took title to Ronald's interest in the Phyllis Avenue property fully knowing that (a) the whole purpose of the transfer was fraudulent, and (b) he was expected to give Ronald's interest back to Ronald when requested to do so. "Though a promise in words was lacking, the whole transaction . . . was `instinct with an obligation' imperfectly expressed. Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 91 118 N.E. 214 [, 214 (1917)]." Sinclair v. Purdy, 235 N.Y. 245, 139 N.E. 255, 258
(1923) (Cardozo, J.).
If the pervasive elements of fraud were removed from this case, the imposition of a constructive trust might be appropriate.[1]
But to do this would be to make the proverbial silk purse from a sow's ear. The fraudulent character of the entire enterprise simply cannot be ignored. This is not an application by a defrauded spouse or creditor. It is an application by the fraudulent grantor himself. Equity "ordinarily has refused to decree such a trust for the grantor because of his participation in the wrongdoing." George Gleason Bogert George Taylor Bogert, The Law of Trusts and Trustees 475, p. 114 (rev.2d ed. 1978). As the Bogerts explain, "[A] trust, like any other transfer conveyance or contract, may be invalid because it seeks to accomplish an illegal purpose. Trusts which have as their purposes the defrauding of private persons . . . will not be carried out by the courts." Id. 211, p. 57 (rev.2d Ed. 1992).
This principle is illustrated by Pappas v. Pappas, 164 Conn. 242,320 A.2d 809 (1973). Pappas was an action for the reconveyance CT Page 2264 of property brought by a plaintiff who had transferred his real estate to his children one week before his wife instituted a divorce action against him. At a deposition taken in the divorce action, he falsely testified that the transfer had been made in return for valuable consideration. After the divorce, one of the children refused to reconvey his interest to the plaintiff. The trial court imposed a constructive trust, but on appeal the Supreme Court set it aside because the plaintiff's testimony had "constituted a fraud on the court." 164 Conn. at 245. The court stated that,
 It is a fundamental principle of equity jurisprudence that for a complainant to show that he is entitled to the benefit of equity he must establish that he comes into court with "clean hands." . . . The clean hands doctrine is applied not for the protection of the parties but for the protection of the court . . . Thus, where the granting of relief would amount to a condonation of perjury, the court should deny relief to protect its own integrity.
Id. at 245-46. Here, the court reasoned,
 There is no question that the plaintiff testified as he did to save this property from the claims of his wife, but in doing so he committed perjury in furtherance of his plan to retain ultimate possession of the property. It can thus be seen that the equity which the plaintiff now seeks in this action is directly and inseparably connected with his prior perjury. Were we to grant him the relief requested, we would be condoning an unpurged act of fraud on the court.
Id. at 246-47.
Subsequently, in Cohen v. Cohen, 182 Conn. 193, 438 A.2d 55
(1980), the court emphasized that the distinguishing feature of Pappas was the intention of the grantor "to perpetrate a fraud upon the court." Id. at 205. The plaintiff in Cohen had given her son joint title for a condominium purchased with an inheritance in order to protect it from her estranged husband's creditors. This action had not constituted a fraud upon anyone, CT Page 2265 and a constructive trust could consequently be imposed.
The considerations just mentioned adequately distinguish Pappas from Cohen and justify the holdings of both cases. Cohen, however, added a further justification for its holding that clouds this distinction and has become a bone of contention in the instant case:
 [I]t is a well-established rule of equity jurisprudence that "[t]he party to a suit, complaining that his opponent is in court with `unclean hands' because of the latter's conduct . . . must show that he himself has been injured by such conduct, to justify the application of the principle to the case. The wrong must have been done to the defendant himself and not to some third party."
182 Conn. at 206 (quoting 2 John Pomeroy, A Treatise on Equity Jurisprudence 399, p. 99 (5th ed. 1941). (Emphasis added by the Supreme Court.)
What are the limits, if any, of this rationale? If taken literally and applied across the board, it nullifies Pappas, for the ungrateful son in Pappas was no more injured by his parent's conduct than was the similarly ungrateful son in Cohen. But Cohen shows no sign of intending to overrule Pappas. It takes pains to distinguish Pappas and by implication recognizes Pappas's continued vitality. It is, consequently, necessary to reconcile the holdings, if not the language, of the two cases.
The answer to this conundrum lies in the fact that the clean hands maxim is not a unified equitable principle but, rather, "a string around a loose bundle of separate defenses which somewhat resemble each other." Zechariah Chafee, Jr., Coming into Equity with Clean Hands 47 Mich. L.Rev. 877, 1092 (1949). As Chafee demonstrates, cases employing this maxim fall into a number of different categories, and the application of the principle "is largely shaped by the human practices and public policies involved in the situation." Id. The use of the principle in a case like Pappas, which involved a fraud perpetrated on the court, is one thing. Its use is a case like Cohen, which involved no fraud on anyone, is quite another.
"Today, `unclean hands' really just means that in equity as CT Page 2266 in law the plaintiff's fault, like the defendant's, may be relevant to the question of what if any remedy the plaintiff is entitled to. . . . An obviously sensible application of this principle is to withhold an equitable remedy that would encourage, or reward (and thereby encourage), illegal activity." Shondel v. McDermott,775 F.2d 859, 868 (7th Cir. 1985).
This principle can be traced back to the legendary Highwayman's Case of 1725, in which an English robber sued his partner in crime claiming his share of booty (gold watches and the like) acquired during their joint enterprise. The court dismissed the case and, for good measure, hanged the parties and threw the plaintiff's lawyers into prison. The Highwayman's Case, 9 L.Q. Rev. 197 (1893). See McMullen v. Hoffman, 174 U.S. 639, 654
(1899). In somewhat less colorful cases, the Connecticut Supreme Court was recognized that actions brought on illegal or corrupt bargains, not seasonably repudiated, cannot prevail if the parties are in pari delicto. See Greenberg v. Evening Post Association,91 Conn. 371, 375, 99 A. 1037 (1917); Merwin v. Huntington,2 Conn. 209, 212 (1817). As Chafee explains,
 The real objection is not to one man's clean hands but to the whole enterprise. The court does not want to touch an unlawful transaction with a ten-foot pole. It always refuses to help carry it out, and it often refuses to pick up the pieces after the enterprise has fallen apart. Courts were set up to enforce the law, not to enforce violations of law.
Zechariah Chafee, Jr., supra, 47 Mich. L.Rev. at 896.
Was the main transaction here illegal or corrupt, at least for purposes of the rule just described? The answer is plainly yes. The sole purpose of the 1986 conveyance from Ronald to Richard was to defraud Ronald's wife. In furtherance of this corrupt bargain, Ronald twice signed false financial affidavits, which, essentially, worked to deceive and defraud the court and were intended to do just that. These false affidavits, which went "to the very heart of the judicial proceeding," Casanova v. Casanova, 166 Conn. 304, 305, 348 A.2d 668 (1974), were the equivalent of the perjured testimony in Pappas and find no parallel in the facts presented in Cohen. To further tarnish his already thoroughly blackened hands, Ronald subsequently filed a false statement with his bankruptcy petition, thus potentially CT Page 2267 defrauding the federal court as well as the state court. The court recognizes that an incomplete listing of assets is not as serious in a chapter 13 bankruptcy as it is in a bankruptcy filed under chapter 7, since chapter 13 does not normally contemplate liquidation of the debtor's property. But Ronald's three-year repayment plan under chapter 13 has not yet been completed, and under 11 U.S.C. § 1307(a) he has a right to convert his case to a case under chapter 7 at any time. The fraud upon the courts here is multiple, pervasive, and unpurged. It should not be rewarded or encouraged in any way.
IV. CONCLUSION
For the foregoing reasons, judgment shall enter for the defendant.
Dated at Waterbury, this 3rd day of March, 1993.
/s/ Jon C. Blue, J. JON C. BLUE Judge of the Superior Court